is weather back this morning for you. Feels like home, Your Honor. Thank you. May it please the court. My name is Anne Carter and I represent the Pellant defendant, Justin Schneider. This first case this morning is Mr Schneider's conviction for possessing firearms, a firearm and assault against a federal officer. We are asking the court to vacate Mr Schneider's convictions and remand for reconsideration of his plea agreement, a new trial or an alternative re-sentencing. I'm going to begin this morning with the personal presence issue. Mr Schneider had a right to be present at all stages of his trial. A trial has commenced when jury selection process begins. You agree, counsel, do you agree that subject to harmless, that that argument is subject to harmless error analysis? Yes, Your Honor. I agree that that is our court's precedent. We believe we prevail under that standard. I mean, your client's trial counsel was there. I mean, what specifically is the I mean, point me to what what gets you around the harmless error. Mr Schneider missed the opportunity to observe the jurors reactions the first time they heard his name and his charges. The first time they heard his name. That's that's the key issue that the entire panel assembled. How many were on there that were later on his on his panel or on his jury? There were 90 people in I believe there are 90 people in the room. It was a 12 person jury with one alternate. In addition to his name, it is his charges that he has a firearm, that he's accused of assaulting a federal officer. And that's really all that was discussed about his case at that without his him being present, right? That is correct, Your Honor. You have any case that comes close to saying that sort of split second glancing at 90 people is not the sort with counsel there is the sort of thing that we would say, boy, that's that's not harmless. No, Your Honor, I don't have a case that matches this specific scenario because the vast majority of this court's cases on the right to personal presence involve a defendant who is disruptive and essentially waives that right. Here, Mr. Schneider had invoked the right and it was denied and he didn't lose it because of his own behavior at all. But that first impression, the jurors reactions to that is their most honest reaction to the information that they're going to hear, the most unguarded. It's his name, though, and they know he's there on a, they know they're there on a felony charge. It's his name and his charges and the district court's admonition that the jurors need to be fair to both sides, that they need, that they shouldn't be on the jury if they have a bias against the FBI or if they think that someone is charged, they are automatically guilty. Only one side was present in that moment. Mr. Schneider is a member of... Now, so weren't all of those questions questions that could and should have been taken up in the voir dire for your client's specific case? Yes, yes, Your Honor, they should have been. Were they? Yes, yes, yes, Your Honor, they were. Specifically, however, we're noting that it's that first time that the jury knows what this case is about, that that is the concern here. And Mr. Schneider is from this community, his attorneys are not. He may be aware of those local biases, those local preferences that can be prevalent when the jurors hear those charges. I would like to move to the plea agreement issue in this case. The district court... I guess I have one last question, that is, was there anything in the actual trial to indicate that any juror that was seated was not an objective juror? No, Your Honor, there's no indication of that. There's no indication of any jurors' behaviors in the record here. I would note that harmlessness on this issue is the government's burden to prove beyond a reasonable doubt. On the plea agreement issue, the district court erred in believing that this was a Type C plea agreement. I wonder if you don't have a harmless error issue here, too. I mean, we can argue about what that paragraph, how it's best interpreted. The district court thought it was a subsection C agreement, and the court gave your client the opportunity and the government to strike the offending paragraph or amend the offending paragraph and come back, and your client changed his mind. Why isn't that, even if we think it was a misinterpretation of the plea agreement, kind of a harmless error when your client backed out of the deal? Your Honor, that paragraph was part of the deal. It was part of what he had bargained for. But the district court was worried about the word stipulation. It could have been rewritten to make clear... The district court was not sure whether it was going to be bound or not, and all you had to do was make clear that it was not binding. And what happened, I mean, is your client, in the intervening time, changed his mind, and that's his prerogative, isn't it? Yes, Your Honor. Ultimately, it is his decision whether to go to trial. I think the district court's problem was the joint recommendation for offense-level guideline calculations, that the district court was upset that the parties had agreed on that. Well, I think that it was concerned that it would be bound by that. Yes, Your Honor. I mean, the district court doesn't prohibit plea agreements where both parties say we think it's a base offense level of X, does it? Your Honor, I'm not as familiar with the procedures in the District of South Dakota, but reading that transcript, it appears that that was the district court's problem, is it did not like that the parties had agreed to the guideline calculations. Regarding prejudice, the rejection of the plea agreement prejudices Mr. Schneider because he then goes to — he doesn't get the benefit of his bargain. He goes to trial. He's ultimately — His choice. His choice. It don't — it was not his choice to have the agreement that he — that he chose. It was rejected, I think, Your Honor, and ultimately he gets convicted of an additional charge with a 12-month consecutive sentence. We don't know if he lost the benefit of the bargain because he did — the judge was continuing the inquiry and he backed out. He pled. Your Honor — We don't know if he would have lost the benefit of the bargain. I think it is fair to infer that the judge would have studied that paragraph and said, well, okay, it's not binding. Then he gets the benefit of his bargain. Your Honor, I don't think it — I think the record is clear that the district judge had already made his decision. He had a research memo from his law clerk. He had written a letter to the United States attorney explaining his reasons for rejecting it. With that — He had made up his mind on the binding question or on the sentencing? On the binding question, that this was a binding agreement. Well, when both of them say, no, Judge, it isn't — it isn't binding, and the judge said, well, okay, I'm going to continue this and look further into it, that's what judges do. It's not a changing their mind. They get more information or more — or changing their positions, and they rethink. We don't assume that district judges lock themselves into a particular position or frame of mind. Your Honor, I agree we don't assume that, but I think the district court here made it clear that that is what he was doing, that he had decided already. And that is why he wrote the letter to the United States attorney. With that, I would ask to reserve the remainder of my time. Thank you. Mr. Tonum. May it please the Court, Counsel, I'm here today representing the United States. My name is Carl Tonum. I would request the Court affirm the appellant's convictions and remand for re-sentencing in accordance with the applicable guidelines. I'd first like to address the Court's qualms concerning the plea agreement that it expressed at the change of plea hearing. You're going to have to speak up for me. I'm not coming close to hearing it. I'd first like to address the Court's qualms concerning the plea agreement and the language in that plea agreement concerning guideline stipulations. Well, the district court was wrong. That's the government's position, right? This was not a subsection C plea agreement. That was error. Correct, Your Honor. It was a brand B plea agreement. I assume it's a – you would have – you would have just simply say it's harmless error, though. That's correct, Your Honor. I'm interested in your evidence on the simple assault on a law enforcement officer. That's an – there's an intent requirement in that, isn't there? That was a lesser-included offense. There is, Your Honor. Where is the – where is the evidence of an intentional simple assault on a law enforcement officer here? Your Honor, well, certainly at trial there was a lot of focus on the standoff, the arm standoff, the pacing, et cetera. I think the best evidence for the intent of a threat lies in the appellant's conduct when he drove towards Lieutenant Badhand. That immediately followed hot on the heels of that arm standoff, and he did veer into the ditch at the last second. Well, let me – that's interesting because isn't – isn't a truck a dangerous weapon? It is, Your Honor. And the jury acquitted on the weapon issue, correct? They did, Your Honor. So does that leave you any room to argue that that was the simple assault or not? I believe it does because I – first of all, Your Honor, I wasn't in the room. I have no idea. Well, none of us were, but – so we're all looking at the same record. I just – that to me is the closer issue for the government here. The weapon, as I understand it, the two other incidents that are put forth as possible bases for the simple assault, the weapon was not pointed at the officer and there were no direct threats. Is that correct? That's correct, Your Honor. Walk me through, if you will – I cut you off earlier – how the car – how the veering, losing control, regaining control, and driving away is simple assault. Your Honor, the United States had focused on the threat aspect there. The intentional – That's big enough. You got it. Thank you, Your Honor. First off, look toward the audience. Your Honor, I would draw the court's attention to the threat, not the actual attempt to harm the United States. And it's not alleging there was any – But it's an intentional threat, correct? Correct. Driving? So is I – if I remember the video, the officer who would have been the victim of this, was he parked on the road or on the side of the road? He was parked towards the side of the road, Your Honor, but partially occupying the roadway. All right. Yeah. Go ahead. And he would have been in the opposite lane of traffic. So from the defendant's – from the appellant's perspective, he would have been in the left-hand lane. The appellant drove down the left-hand lane against traffic towards the officer's car, then veered into the ditch at the last second. Given the appellant's previous conduct, a reasonable officer in Lieutenant Badhand's position would have been in fear for imminent bodily harm due to the likelihood of being struck by that vehicle. I think I get that. Is that enough when you need to show an intentional threat? I mean, I think it's in the broader context, the appellant here was fleeing the scene. He was fleeing the scene, Your Honor. I think that's fair. But in the course of so doing, he nearly struck the officer. If the – Nearly struck the officer? Is that – is that what the video shows? I would – I suppose your argument is a jury could come away with that conclusion. A jury, a reasonable jury could come away with that conclusion. I would conclude, Your Honor, on that, that if it wasn't his intent to threaten the officer, why didn't he just drive in the right lane? Was there any argument made to the jury? No. That was not the focus of the party's argument at closing. It was exclusively on whether or not the appellant's use of a firearm to act as a, from the government's perspective, a shield or a long poking stick, so to speak, to keep the officers at a distance, constituted forcible resisting and impeding. So, I mean, I don't know that it matters, but the government never made an argument that – never had a conversation with the jury that we're having here. Not that I recall, Your Honor. It might have been briefly adverted to, but certainly the focus of the government's argument, as well as the appellant's argument, was on the brand of the armed showdown in the past year and then in Bullhead itself. Moving to the plea agreement. As noted, the court, the district court erred, from the government's perspective, in characterizing this as a Paren B plea agreement. However, one, as noted by the appellate court, there was no final rejection. There was an invitation to continue this plea hearing as the parties continue to work through this and present possible additional arguments to the court. Second, the court did not exclusively or perhaps even primarily reject this plea agreement because it viewed it as binding. The court expressed that it was concerned about a number of other factors. I would draw the court's attention here to the problems, notwithstanding the fact that I entered into this plea agreement. I know what? To the problems that stipulated guideline.  I don't understand the problem. We're not talking about a problem. When the parties stipulate to guidelines, Your Honor, in many ways, they can have the effect of cabining their arguments and imposing a straitjacket on them at sentencing. New facts often arise. Government promises to dismiss or whatever, or the promises that will not contend for a drug quantity more than X. So what does that have to do with this? Your Honor, I think in particular in this case, there were a number of stipulations that both parties entered into. I think part of the court's concern was that new facts would arise during the pre-sentence investigation. But if it's not binding, I mean, the court can inquire at sentencing and at any issue it deems relevant, correct? I mean, you're not suggesting, are you, that the government shouldn't be able to enter these plea agreements? No, Your Honor. I didn't think so. You're telling us what the court must have thought, that the court didn't put in the record for us. Correct. You know, we can't do that, can we? I think it's fair for this Court to note that such concerns may have been present and may form an animating factor in any court's decision on whether or not to reject such agreements. All we have is an incomplete dialogue. That's correct, Your Honor. Unless counsel's right that the court's letter to the U.S. attorney should be treated as a definitive interpretation of the court's position at the hearing. Do you agree with that? Not necessarily, Your Honor. I think that's a closer call, but at the end of the day, there was an invitation for the parties to continue negotiations in accordance with the court's guidance before the hearing. That's a closer call. That's what we're hearing this morning. So you're choosing not to argue about the closer call. Why is it a closer call? As to whether the court made a final rejection at the plea hearing of the party's proposed agreement? Well, as to whether the, even if the court had made up its mind before it got to the hearing, I mean, good sentencing judges prepare thoroughly for sentencing, and they, I would think, almost invariably come into the hearing with a, not a predisposition, but you know, if things go as I think at the hearing, if I don't hear anything new and different, I'm inclined to think this will be my answer. There's nothing wrong with that, is there? No, Your Honor. Is that what, is that basically what's being argued here, that that process should be viewed as prejudging? I think it would be fair to say it's prejudging, but of course, open to further arguments of counsel. Counsel, you're saying remand for resentencing? Correct, Your Honor. What is the scope of the remand? The district court committed plein air affecting the appellant's substantive rights when it considered acquitted conduct in applying a four-level enhancement for the felony offense of AFO on a Federal officer. Is this just, I've read a lot of briefs. This is the one where the guidelines changed a couple of days before the sentencing hearing? Am I on the right track here, or is that another case? That is this case, Your Honor. Neither appellant. And I don't think the government corrected the district court either at the hearing, did it? No, Your Honor. It caught everyone off guard. Pardon me, Your Honor? No one was aware of the sentencing guideline changes, apparently. That's correct, Your Honor. Thank you. Thank you. For Rebo? Thank you, Your Honors. I'd like to begin by addressing some of the court's questions regarding the assault conviction. The government did not argue an assault theory at the trial. In fact, they opposed the instruction on the lesser-included offense because their theory, as indicted, was that this was resisting or impeding. But we're looking at whether there's, in a sense, that doesn't matter, does it? We're wondering if there's enough evidence in the record for any reasonable jury. I may be phrasing that slightly off, but it's a pretty low standard, right? And isn't it fair to infer, or wasn't it fair for the jury to infer from that flight that there was an intent to put the officer who was parked on the road under threat? Your Honor, I don't think a reasonable jury could reach that conclusion. I direct the court's attention to Exhibit 51 at about 30 seconds. That's the dash camera footage. Say that again. Exhibit 51 at about 30 seconds. We can see Mr. Schneider pull out of the driveway. His truck fishtails momentarily. He regains control of it. And almost immediately after he regains control, he swerves to avoid the cars that are parked on that road. With that, I can see I'm out of time. So I would ask the Court to vacate the convictions, remand for reconsideration of the plea agreement or trial, or in the alternative, resentencing. Thank you.